May it please the court. James Spertus for Appellant Alaa El Bealy. Your honors, this case proceeded to trial on 16 counts and there were acquittals on 11 of the 16 counts. It was a very very hard-fought and close trial. Do I have this right that the government did in fact have in its possession five currency transaction reports? It did not produce them before trial? That's correct. It came out. And was there argument at trial that, did they argue there were was never a CTR? They argued that there was never a CTR filed for a cash deposit over $10,000 and in the government's briefing they are parsing words by saying that's technically correct but the spirit of the government's argument was clearly that there were no CTRs ever filed and we've quoted extensively from the government's closing argument and from the testimony of the... Now structuring convictions there people can be and often are convicted of structuring even though CTRs were filed because the jury decides they were trying to avoid the filing they just didn't succeed. That's correct. Was any such argument made in this case? The government's argument ultimately there were acquittals on three of the five structuring counts. The government's argument was much broader than the jury accepted. On the two counts of conviction the government argued that because deposits were made into two bank accounts the combined value of those two deposits exceeded $10,000 and the point is that literally on the eve of trial the government had designated a summary witness and expert witness Michael Nader to testify about structuring and it wasn't until the testimony was unfolding in the courtroom that it became clear that the government's theory was a lack of CTRs. Tell me something about this. I don't understand why the case was close, why it was a hard case for the government to make and I'm a little unsure of whether there was any prejudice from the putative Brady violation. Here's why. The guy had two different identities and it looks like he was funneling a whole lot of cash in under an identity that he didn't pay taxes on with a fake Social Security number. That seems like kind of an easy case. I don't know what they needed experts for, why experts testified. Your Honor, respectfully that wasn't even the government's theory on the tax issue. Mr. Bialy had a market. His income was received in cash and deposited on a very regular basis in the bank accounts. But not under his name that he paid taxes under. Well the defense theory on the name issue. It's kind of like if I had one bank account for Andrew Jay and another account for Jay Kleinfeld and I paid taxes on the Jay Kleinfeld account but I put on all the cash I received which is most of what I did receive in the Andrew Jay account. Well, Your Honor, the defense theory was that the Ali name was not another name. Well, the reason I made my hypothetical Andrew Jay and Jay Kleinfeld is that those are all really my names. Just like this L. Bialy fellow. I understand the court's point but the corporate tax returns for the market were never even introduced by the government. They weren't even insinuating a tax motive for this. The government simply took the position that if somebody had What excuse could there be for having two social security numbers? The defense presented evidence that Mr. Bialy had sent a friend to get a replacement card. There was clearly a request for a replacement card immediately around the time a new card issued. Under a different name and different number. Yes. I mean if I needed a social security card replaced, I'd probably have lost mine decades ago. I know the social security number and I'd get one under the same name and social security number. Why would an innocent man get a different name, different social security number? And the defense presentation was why would a guilty man give the true A number to the social security department when seeking that? What we know is that Mr. Bialy had sent a friend to get a replacement card and Mr. Bialy's friend checked the wrong box. It was a very contested issue on whether or not Mr. Bialy was trying to get a fake alias to commit some crime. And I think the jury rejected that, that view of the facts. I think the, I mean, for example, your honor, the defense stipulated to all of the elements of guilt for counts 13 through 18 except for the one element that he committed any material fraud in connection with applying for his naturalization certificate nine years and 360 days earlier. And the jury. That's one where he said he, he checked the wrong box. He said he hadn't done something that he had done. That he hadn't been issued a previous number when in fact he had. That box should have been checked. Yes. And the trial evidence was very interesting on that issue because the, the replacement application clearly was a different handwriting and signature from Mr. Bialy's. The, the both parties presented the signatures and the, and the documentation for the government's view and the jury rejected it. The defendant was an immigrant to this country who had worked lawfully in a cash business for many years and applied according to all the procedures that were known to him for citizenship and ultimately was interviewed and tried his best in the process to become a citizen. It's true, the government can very effectively excerpt facts taken from the trial evidence and say, well, this shows a guilty mind for alternative reasons. But, and that's what the government did. It listed the, the obtaining a driver's license and all the dates the driver's license were obtained. It was a vehicle violation, actually. A vehicle code violation, actually, that would not have disqualified Mr. Bialy from citizenship. But they painted the facts in a very nefarious way. And I understand how a reasonable mind could conclude there was some nefarious activity going on. Just like in the United States versus Puerto, where a defendant was arrested, was also alleged to have had a different name, had multiple false IDs in his pocket. And this court said, smells bad, but it didn't sufficiently establish the materiality requirement for the naturalization violation. Mr. Sparadis, I want to focus for a minute on the alleged Brady violations. And specifically with respect to counts seven, eight, and twelve. As I view the five CTRs that were not produced, probably could have been used to directly impeach Mr. Nader's testimony, where he emphasized that there was not a single one of the transactions he analyzed. There was a deposit over $10,000. But I don't know what we do with it. Is there a harmless error concept here if we find that, in fact, it could have proven to be adequate impeachment evidence, but we're not sure? What do we do with this? Well, there is a materiality requirement for a Brady violation. And I believe those issues are subsumed in the materiality analysis. And I think that if the court were to view the government's evidence for count 12, which was essentially a misstatement of the law by a government expert, I think that the jury – I think it's impossible to find a harmless error or a lack of materiality when the government's arguing that if you find the defendant had bad moral character, you could convict him on count 12. And essentially, that was the government's presentation. They said the naturalization process pivots on whether or not you find a defendant had good moral character when he applied for citizenship. How much of the government's case relied upon the testimony of Mr. Nader and what he found in terms of how much was deposited? I think count 12 – 7, 8, and 12 are the ones that are dependent on that. And I think that count 12 – the government very much is distinguishing count 12, but it's the way that count 12 was charged and presented to the jury that really makes the CTR issue material. Because if the jury was told by misinformed, despite the jury instructions – and I understand that the court properly said the misrepresentations must be material – but the government's expert is telling the jury bad moral character is the materiality issue. And then they present really an appendage in the structuring case to the false statement part of the case by saying, look how bad this person is, as Justice Kleinfeld just identified at the start of argument. It smells horrible for a guy to deposit money into two accounts with two different names. And the jury very clearly, I submit, came away thinking that because of the structuring charges that they convicted him on, this individual has bad moral character, so he's also guilty on count 12. I'm not sure that that follows. Even if you have a material Brady violation on the other counts – here's my problem on count 12. In 1992 or so, right after he comes to the U.S. from Egypt, he gets a Social Security number as Ala Yahya al-Biyali, with a birth date of July 23, 1967, and a birthplace of al-Banawan in Egypt. And he gives them his Egyptian passport number. And then in 95, about two or three years later, he gets another Social Security card, different number, different name, Ala Ismail Ali, different date of birth, September 23, 1969. Nobody makes a mistake on their date of birth. Different place of birth, Garbia, Egypt. And on the second card, he doesn't use his Egyptian passport to identify himself. He says, here's my resident alien number. You can check that for my identity. But that wouldn't have turned up the first Social Security card because he didn't use the resident alien number on the first one. And on the second application, he says he's never received a Social Security number before. And then on the naturalization, he also falsifies the form. Why isn't that enough so that even if he beat the criminal charges, he would still lose his naturalization for lying to the INS? And I would have possibly liked to reserve one minute for rebuttal, given the time left. But first of all, the Senate did not have a U.S. passport at the time that the replacement card was obtained. He used his INS number because that was his U.S. identifying number. I didn't say U.S. passport. He used his Egyptian passport the first time. He didn't use it the second time. He used the INS number the second time. He didn't use it the first time. Right. The defense presentation was that Mr. Bialy did not fill out that form, that he had a friend going to the Social Security office. He had applied for a replacement card, and his friend filled out the form incorrectly. And the handwriting on the form bore that out. I thought he didn't just fill out a form in which he said he never used any other names. He also had an interview with, and he confirmed in the interview, the written statements. Right. If he didn't believe that he was using another name, he's not lying during the interview or on the form. And that's the materiality issue. That's what U.S. v. Squerka focuses on. People can use other names. There's nothing wrong with that, even if it's a wrongfully obtained name. There was no criminal history under the alias. There was nothing that would disqualify for Mr. Bialy from citizenship by using the alias. The crime that the government is alleging as one of the four ways that it advocated for guilt on count 12, it was a very complicated statute. And it was indicted in a way that was almost guaranteed to allow for non-unanimous verdicts, because the jury could just find guilt or not guilt on four different theories without a special verdict form. But the government's presentation was that they know the government's burden was to produce the evidence that showed that the failure to disclose the other name was material in that it would have disqualified Mr. Bialy from citizenship. And they didn't present any facts for that. This became a moral character trial. And it morphed during the trial into whether or not Mr. Bialy is a good person or a bad person for the reasons the Court articulated. The Court is raising very valid points. And the jury obviously didn't think that Mr. Bialy intended to lie. They acquitted him on counts 13 through 18. But they felt that for the facts articulated by the Court that were advocated by the government, that he lacked moral character. So they therefore convicted him for one of those four reasons that could support a guilt finding on count 12. I tried very hard to get clarity in the jury's verdict during the trial. This Court has encouraged the use of special verdict forms in cases where how the jury finds guilt is very, very important. And to answer precisely Your Honor's questions, I would have to know which of the four theories they unanimously agreed supported guilt. The fact that there were acquittals on counts 13 through 18 is very significant to show the uncertainty in how they reached their verdict. I think you've exhausted your time, so let's now hear from the government. Thank you. Do I have one minute for rebuttal? Well, we'll see. We'll see. May it please the Court. Melanie Sartoris for the United States. In light of the Court's questions, I'd like to start with the Counsel, let me start you off with something that's on my mind. It's real clear under Brady that a pure heart and an empty hand or empty head on the part of the prosecutor does not mean there's no Brady violation. The Supreme Court made it real clear that it was well aware that if that were due, then the police would purposely keep the Brady evidence from the prosecutor so the prosecutor would have a pure heart, I didn't have any other documents, and then Brady could be violated with impunity. This case, the government had five CTRs that didn't produce them. There were some arguments that could be made that those CTRs were inculpatory. There are arguments that could be made that they were exculpatory, and there are arguments that could be made that they really didn't bear very heavily one way or the other. In that circumstance, I just don't see any excuse for not finding them and producing them. The case is about structuring. You look for CTRs. Your Honor, I agree the government should have produced the CTRs, but that does not equate to a Brady violation, and that's because for it to be a Brady violation, not only does the evidence have to be suppressed, which the government would suggest that it was not suppressed, but it also has to be material, and it has to be in some way either impeaching of a defendant or... Well, it sure would impeach Nader, and it might be exculpatory, depending on how the case was argued. Actually, the government would say it would not impeach Nader, and here's why. There's a particularly... There's timing issues here, which is something that I would like to address. The five CTRs that the government possessed prior to trial, none of them overlapped with Special Agent Nader's testimony. Special Agent Nader testified regarding all of the bank records the government... Boy, if the government is using that kind of reasoning to avoid Brady, that would mean that if the government's star witness had been convicted of perjury twice, in 2000 and 2004, but the perjurious witness was testifying in 2008, then the government lawyer could say, well, they don't need to know about that. It's different times, a long time ago. That's a fair point, Your Honor, and the district court did, in correctly finding that there was not a Brady violation here, the district court did note that there was minimal impeachment value of Special Agent Nader. Let me be sure I understand your point, because the timing may, in this instance, may have some bearing on materiality. If Nader's testimony was, for example, that he never saw a deposit of over $10,000 from period 4 to 7, and the CTRs were from period 1 and 2, and he may or may not have been involved, then they would have no impeachment value with respect to Nader, because he wouldn't necessarily have seen them. Is that what you're saying? That's exactly what I'm saying, Your Honor. The government, Special Agent Nader reviewed all of the bank documents the government was able to obtain under the Ala Ali alias, and those bank records began in 2003. The five CTRs that were in the government's possession were from 1999 to 2002, so they didn't overlap with the 404B testimony that Special Agent Nader gave. They also involved a different bank account than the bank accounts that were at issue in the government's, that the government charged in the indictment, or any of the, they also did not involve the bank accounts covered by Special Agent Nader's testimony. So Nader never saw the bank account, never dealt with the bank account that these CTRs covered? That's correct, Your Honor, and the jury didn't receive any information on that, yet another Ala Ali bank account that the defendant had, but the only information about that that the government had in its possession would have been the five CTRs. Counsel, isn't there an argument to be made here that given the broad nature of the charges and what's being brought here, and given the refrain that I sense in the government's argument on this case, that that would have been material for the defense to counter that type of an argument and approach? I mean, there was a custom practice, MO, that was presented by the government through a refrain, and it was apparently effective. You got convictions on the counts that were most significant on what were reported materials so that the defense can counter it and say, well, taking a broader swatch, we were going through the CTRs. Your Honor, I would disagree. First of all, I would not agree with Defense Counsel that it was a very close case. The what the additional information, you know, the government doesn't have the underlying bank records for those five CTRs. It's just the CTRs. But we know from the CTRs it was a separate bank account, another Allah Ismail Ali bank account. And at most, that would allow Defense Counsel to say, sometime prior, at some point the defendant had a bank account in this name, and on five occasions deposited more than $10,000. I don't know whether that was in a 24-hour period. We just don't have the underlying bank records. Let's just say hypothetically that these CTRs would have had no benefit whatsoever in impeaching Nader. But they could have been introduced to show that, in fact, deposits of more than $10,000 were made. What importance would that have had, if any? So that's where the district court was correct in finding that the CTRs wouldn't have been material, in light of the overwhelming evidence. Because these CTRs were covered, covered a time period from 1999 to 2002. The charges, all of the charges of the indictment, not only were they with respect to different accounts, but they also focused on 2007, 2008, and 2009 banking activity. Let me ask you, it sounds like the government is equating materiality with harmless error. In other words, if you got overwhelming evidence, and it would otherwise be harmless error, because there's so many other things that would convict him, that materiality is equal to that. That's not my understanding of what materiality means. Did I misunderstand you? Yes, Your Honor. To be material, the evidence would have to have a reasonable probability of a different result. Okay. So it's in the result, not in whether you could impeach, for example. That's correct. Whether or not it's impeaching or if sculpture is a separate consideration from whether or not, then it's material. So, for example, if the jury, in listening to Mr. Nader, dealing with the time period that he discussed, showed the structuring pattern where it was clear that there was no reporting, that's all they need to find. Even if he did put something more in at another time period, that would still have given the jury enough to find that, in fact, there was a structuring. And you could prove up 7, 8, and 12, basically. That's right, Your Honor. And I think that the jury's acquittal of the defendant on three of the structuring counts really does illustrate that the jury was focused on the time period of the indictment, 2007 to 2009, and didn't, as defense counsel suggested, accept the government's broader argument that the defendant had a pattern of structuring of these counts at all times. They specifically acquitted him of three structuring counts, finding that he didn't always structure his banking transactions. Sometimes a jury acquits just because it has a reasonable doubt, not because it thinks the defendant didn't do it. And then it convicts where the evidence is even more plain on some counts. And on this one, what worries me is Nader said repeatedly, over and over again, not a single one was over 10,000. And the government argued that basically the defendant never made a mistake. He always kept them under 10,000 to avoid the CTR reporting. That's correct, Your Honor. The government did focus on the bank records and the defendant's possession, which did demonstrate that the defendant never made it. Basically, it makes him out to be a very clever evader. And the argument for innocence in a case like this is basically, I'm a dumb guy, I didn't realize, I forgot. That may be so. Like I'm checking the wrong box. The government did have the burden to also prove knowledge, which is another reason why the government would find that these CTRs were actually inculpatory, because it was the government to prove beyond a reasonable doubt that the defendant had knowledge of the reporting requirements. If the government had produced the CTRs and argued to the jury that they were inculpatory, I would think, hmm, good argument. But the jury never got to find out about it at all. That's correct, Your Honor. And that is regrettable. Could you focus a little bit more? Let's say you lose on the Brady argument and it kills your convictions on the counts relating to structuring. What happens to the naturalization count? There's no crossover between, no reasonable crossover between the structuring counts and the naturalization counts, and here's why. The naturalization counts, it's very clear from the record, focus on the 2000-time period and prior. The entire, the question of did defendant obtain his naturalization by fraud has a place, and it's the date he obtained his naturalization certificate, which was in 2000. All of the structuring counts were in 2007, 2008, and 2009, and all of the bank evidence that was introduced covered the 2002-2009 time period. So there was never an argument, there wasn't any evidence about banking. Hold on just a second. I missed some of those dates. Let's see. The time period for the naturalization is what? 2000. 2000. And the time period for the structuring is what? The charges of the indictment were 2007, 2008, and 2009. 2007 to 2009. Now, what were the years for the CTRs that the government had and didn't produce? 1999. And that CTR was discussed in a search warrant affidavit that was produced to defense counsel, that particular CTR, and defense counsel didn't make any issue of it at trial, which does undermine his argument that if he'd had the other four. Was that CTR produced, are you saying? The actual CTR was not, but it was discussed in the search warrant affidavit, the existence of it, and the government made available. Oh, the search warrant application said there was a CTR from 99? In the alias male elite identity, and the letters that corresponded with the production of that search warrant affidavit to defense offered to make any item of evidence available. I'm trying to find out what the defendant could get. The defendant could get the affidavit that supported the search warrant application, right? The defendant had the affidavit that supported the search warrant. Okay, and that mentioned that there did indeed exist a 1999 CTR? Yes. Okay, what about the others? And the government offered to make everything discussed available to defense for its inspection, copy, and review. And he didn't look at them? He didn't ask to see them. What about the other CTRs that weren't produced? The other four CTRs that were in the government's possession prior to trial and not produced were just, it was just inadvertent. What years were they? They were covered, they were, none of them were past 2002, but I don't, I'd have to, I don't recall, they were, between 1999 and 2002, it's the best I can do right now. Okay. So they did apply to the timing of the naturalization count, the ones that weren't produced? The ones that weren't produced, some of them, yes. And that would have, that production would have, then defense counsel maybe would have had an argument that that would have gone to moral character because it would have shown another bank account in the false identity prior to his naturalization. I'm wondering, the CTRs that were not in the naturalization count, count 12, why wouldn't the Brady violation, if there was one, be material to count 12 because it would, the CTRs would tend to show that he had in fact complied fully with the law by signing the, I think the CTRs. That's, there wasn't an argument regarding structuring that involved the naturalization. The naturalization counts allege that he lied to USCIS, INS at the time, four, in four ways. Really one, that he lied about using other names and that he had committed crimes that he did not tell INS about. That would be the structuring. Not the structuring. So the four, the three crimes that are part of the naturalization charge are the defendant falsely obtained the social security number in the false name, the government had to prove and did prove, and it was in the jury instructions, each of those crimes, each element. Okay, what were the others? Getting, obtaining a driver's license in a false name and listing, listing that same false identity, that Allah Ismail Ali identity on his 1997 tax return as a dependent in order to get a tax break that he submitted with the IRS. Okay, so it didn't use the CTRs. That's correct. So on that tax form, that 1997 tax form which he submitted to INS in support of his naturalization and also submitted to the IRS, that Allah Ismail Ali is listed as a dependent, as a cousin. It has the false birth date listed and the false social security number on his tax return. And I also would like to just sort of clarify something the defense counsel said when he was talking about the defendant went in and had a friend sign the social security application. There was no evidence on that. The defendant didn't testify in this case and no friend testified in this case. That was defense counsel's argument at trial that might explain how a person might get a social security under another name, but there was not evidence produced to that effect. I think we've taken you past your time a little bit. Thank you for your argument. We'll give you a minute to respond. Thank you, Your Honor. I want to focus directly on the reasonable crossover from the two of the five structuring counts where the defendant was convicted to count 12. The jury agreed by its acquittals, I believe, that the government had failed to prove beyond a reasonable doubt that the defendant lied during the naturalization application process. The crossover is that the government's whole theory for count 12 was that the defendant was a bad guy, and they called an expert,  that bad moral character is sufficient to deny citizenship based on these theories of guilt that the government advanced. That was wrong. This is actually identified prominently in our third issue, which is for count 12 only, the sufficiency of the evidence. There was zero evidence introduced by the government during trial that the defendant would have been eligible for citizenship, and yet that was the standard they were required under CUNJIS to reach, the Supreme Court decision that requires a heightened level of materiality. So first, let's go on a little bit longer. So we thank you for your argument as well. Thank you, Your Honor. The case of United States v. L. Bailey is submitted, and the Court stands in recess. Thank you.
judges: Sammartino, Kleinfeld, Smith